UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
UNITED STATES OF AMERICA,

-against-

ANTIDIO RAMON FAJARDO et al.,

Defendants.
------------------------------------------------------------ X

05 CR 564 (ARR)

NOT FOR ELECTRONIC OR PRINT PUBLICATION

OPINION AND ORDER

ROSS, United States District Judge:

Defendant Antidio Ramon Fajardo makes the following pre-trial motions: (1) he moves to suppress the physical evidence retrieved from the warrantless search of the truck he was driving on September 2, 2003; (2) he argues that joinder of defendants was improper under Rule 8(b) of the Federal Rules of Criminal Procedure; (3) he moves for a severance pursuant to Rule 14 of the Federal Rules of Criminal Procedure; (4) he requests a bill of particulars; and (5) he requests further discovery pursuant to the government's obligations under Brady v. Maryland, 373 U.S. 83 (1963), and its progeny. Defendant Wilford Lindsay makes the following pre-trial motions: (1) he moves to suppress the physical evidence retrieved from the warrantless search of his truck on September 2, 2003; (2) he requests that the government comply with its discovery obligations under Brady and its progeny; (3) and he further requests that the court permit an adverse inference to be drawn from the fact that the government destroyed the truck. The court held an evidentiary hearing on the motions on July 11, 2006, and counsel argued the motions in multiple letter-briefs to the court. For the reasons set forth below, the court denies defendants' motions.

1

## BACKGROUND

The government has indicted Fajardo and Lindsay with one count of conspiracy to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); one count of money laundering conspiracy, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i); and six counts of money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(I). The court conducted a hearing on defendants' motion to suppress the physical evidence retrieved from the search of the truck owned by Lindsay and occupied by Fajardo at the time of the search. After a review of the record, the court makes the following findings of fact with respect to suppression motion:

(1) Detective George Ludwig, a police officer with the Nassau County Police Department, was working with the Drug Enforcement Administration ("DEA") Task Force on Operation Joint Action in the summer of 2003. (Hr'g Tr. 3.) The operation was investigating a drug-trafficking and money-laundering organization run by Gerald Torres. (Id. at 4.)

(2) The operation involved the use of confidential informants, CI-1 and CI-2, whom Detective Ludwig had used numerous times before. (Hr'g Tr. 9.) Detective Ludwig testified that each informant had previously provided information that resulted in seizures of narcotics and money and arrests. (Id. at 9-10.)

(3) On June 1, 2003, CI-1 informed Detective Ludwig that Torres had asked him whether he had the capability to send money to Wilford Lindsay. (Hr'g Tr. 10.) Torres gave CI-1 $35,000 in cash and wanted him to wire it to two bank accounts: a federal credit union account in the name of Wilford Lindsay, located in Little Rock, Arkansas, and an account in the name of Coliam Tropical Fruits in McCallum, Texas. (Id. at 10-11.) CI-1 believed that the cash was drug

2

proceeds. (Id. at 11.) CI-2, who was also present when Torres made the inquiry regarding the wire transfer to Lindsay, relayed the same information to Detective Ludwig. (Id.) The money was never transferred into Lindsay's account. (Id. at 69.)

(4) On August 5, 2003, Detective Ludwig was conducting surveillance of several subjects, and had a uniformed New York City Police Department officer stop them and ask for identification. (Hr'g Tr. 12-13.) Detective Ludwig observed Antidio Fajardo in the group. (Id. at 13.)

(5) On September 2, 2003, CI-1 notified Detective Ludwig that Fajardo met with Torres in Jackson Heights, Queens, and Torres asked Fajardo to retrieve a silver pickup truck at the Crown Plaza Hotel in Manhattan. (Hr'g Tr. 14, 73)

(6) Based on this information, Detective Ludwig notified other units and responded to the location of the Crown Plaza Hotel. (Hr'g Tr. 14.) Approximately eight to ten law enforcement personnel joined Detective Ludwig in conducting surveillance of the hotel. (Id.)

(7) While conducting surveillance, Detective Ludwig heard information from another officer over the radio indicating that Fajardo had entered the lobby of the hotel and that he was seen meeting with a male black subject inside the hotel. (Hr'g Tr. 15-16.)

(8) At the same moment, Detective Ludwig observed a Ford F-150 pickup truck with Arkansas license plates driving into the parking garage of the hotel. (Hr'g Tr. 16.) The license plate registration was relayed over the radio, and the owner was identified as Wilford Lindsay of Little Rock, Arkansas. (Id.)

(9) Several minutes later, Detective Ludwig observed Fajardo exit the hotel, approach valet parking, and give the parking attendant something. (Hr'g Tr. 16.) The attendant

3

subsequently brought the pickup truck from the basement of the parking garage. (Id.)

(10) As Fajardo exited the Crown Plaza lot in the pickup truck, Detective Ludwig followed him by foot and eventually caught up with him. (Hr'g Tr. 17.) Detective Ludwig, who was dressed in plain clothes, then knocked on the driver's side window, with his shield around his neck and with his gun in his waistband, and identified himself as police. (Id. at 17, 27, 30.) Approximately three or four unmarked police vehicles also approached the truck. (Id. at 33.) Fajardo stopped the vehicle and produced his driver's license. (Id. at 17-18.)

(11) Fajardo was then questioned by a Spanish-speaking officer, Inspector Rodolpho Stevens, in the backseat of a DEA vehicle. (Hr'g Tr. 78.) Fajardo was not in handcuffs at the time he was questioned and Inspector Stevens did not have his gun drawn nor did he ever threaten or raise his voice to Fajardo. (Id. at 80.) Fajardo told Inspector Stevens that he had met with a woman in Queens that morning, who had given him the keys to the truck and told him to pick up the truck at the hotel and bring it back to her in Queens. (Id. at 78-79.) When asked whether he would mind if the police searched his vehicle, Fajardo told Inspector Stevens that he did not mind because nothing in the vehicle belonged to him. (Id. at 79.)

(12) After being notified that Fajardo consented to the search of the truck, Detective Ludwig took the truck to DEA field headquarters and searched the vehicle. (Hr'g Tr. 21.) Detective Ludwig took the truck back to headquarters to conduct a more thorough search because he had previously found sophisticated traps located behind the tail lights of another Ford F-150, which was seized based on his investigation of the same organization. (Id. at 21-22.) Indeed, Detective Ludwig removed the tail lights and found approximated $486,000 packaged like sausage links in clear plastic. (Id. at 22-23.)

## DISCUSSION

A. <u>Suppression of Physical Evidence</u>

   1. <u>Investigative Stop of the Truck</u>

Fajardo argues that the evidence retrieved from the warrantless search of the truck should be suppressed as the fruit of an unlawful arrest. In response, the government contends that law enforcement officers conducted a lawful <u>Terry</u> stop of Fajardo. After reviewing the record, the court concludes that there was reasonable suspicion to stop and detain Fajardo and that the intrusiveness of the stop was minimal and appropriate under the circumstances.

It is well-settled that the police may stop a moving automobile to conduct an investigatory stop pursuant to <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). See <u>United States v. Sokolow</u>, 490 U.S. 1, 7 (1989). Such a stop must be founded on reasonable suspicion that the persons stopped are engaged in criminal activity, and that suspicion must be based on "specific articulable facts." <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 844 (1975). The court has no difficulty in concluding that the stop was "justified at its inception" in that there was reasonable suspicion sufficient to stop the truck. <u>Terry</u>, 391 U.S. at 20. Detective Ludwig learned from a reliable confidential informant that Torres, who was believed to be the leader of a drug-trafficking and money-laundering organization, had asked Fajardo to retrieve a silver pickup truck at the Crown Plaza Hotel. (<u>See</u> Hr'g Tr. 14, 73.) After responding to the Crown Plaza Hotel, Detective Ludwig observed Fajardo, whom he recognized based on an identification on an earlier date, (<u>id.</u> at 13), retrieving a silver Ford F-150 pickup truck from the parking garage. (<u>Id.</u> at 16.) Detective Ludwig's observations clearly corroborated the confidential informant's statements. Moreover, Detective Ludwig learned that the truck was registered to Lindsay, (<u>id.</u> at 3), an individual whom

5

law enforcement agents believed was also involved in Torres's organization, (see id. at 2-3). Detective Ludwig had previously seized another Ford F-150 pickup truck in his investigation of Torres's organization and had found a sophisticated secret compartment behind the tail lights of that vehicle. (See id. at 21-22.) Based on these specific articulable facts, an objectively reasonable officer could easily suspect that Fajardo was involved in criminal activity, namely transporting a truck equipped with special traps, potentially containing contraband, at the behest of the leader of a drug-trafficking and money-laundering organization.

Once instituted, the legality of a car stop or any other stop under Terry depends on "(1) the nature and extent of the government's need for the stop . . . judged according to the importance of its law enforcement interests under the circumstances, and (2) the reasonableness of the stop, which depends mainly on the degree of police intrusion on the defendants' freedom of movement." United States v. Pelusio, 725 F.2d 161, 165 (2d Cir. 1983) (citing United States v. Streifel, 665 F.2d 414, 420-21 (2d Cir. 1981)). To determine whether the degree of intrusion is reasonable, the court must consider the totality of the circumstances, including such factors as "the nature of the crime under investigation, the location of the stop, the time of day, [and] the reaction of the suspect to the approach of the police . . . ." Id. (citing United States v. Harley, 682 F.2d 398 (2d Cir. 1982)). If the scope and duration of a putative Terry stop exceed what is reasonable under this test, the police's actions may constitute a de facto arrest requiring the heightened showing of probable cause. United States v. Perea, 986 F.2d 633, 644 (2d Cir. 1993). In making this determination, the court looks to such factors as the amount of force used by the police in relation to the need for such force, the extent to which the suspects' freedom of movement was restrained, the number of agents involved, whether the suspects were suspected of

being armed, the duration of the stop, and the physical treatment of the suspects, including whether they were handcuffed. Id. at 645 (collecting cases).

In the instant case, the court finds that the intrusiveness of the stop was minimal and was reasonably justified under the circumstances. Based on the reasonable belief that contraband was located in the truck, Detective Ludwig pursued the truck by foot, and three or four unmarked law enforcement vehicles approached the rear of the truck. (Hr'g Tr. 10, 31.) Detective Ludwig was dressed in plain clothes with his shield around his neck and his gun on his waistband. (Id. at 17, 27, 30.) He approached the driver's side of the truck by himself and asked Fajardo for his license and registration and also asked him to step out of the truck. (Id. at 17-18, 33.) After Fajardo exited the truck, approximately six or seven other law enforcement personnel walked toward the rear of the truck with their shields displayed. (Id. at 30-31.) Fajardo was then placed in the back seat of the one of the law enforcement vehicles and briefly questioned in Spanish by Inspector Stevens about why he retrieved the truck. (Id. at 78.) Inspector Stevens did not have his gun drawn nor did he raise his voice during the interview. (Id. at 80.) Moreover, Inspector Stevens made it clear to Fajardo that he was under no obligation to answer any questions. (Id. at 78.) Based on these facts, the court cannot conclude that the scope and duration of the stop was unreasonable under Terry.

2.  Search of the Truck

Lindsay and Fajardo argue the evidence retrieved from the truck should be suppressed because the warrantless search of the truck, which required its partial dismantling, was conducted without probable cause and fails to fall within any other exception to the warrant requirement. The government contends that the search of the vehicle was lawful because Fajardo freely and

voluntarily consented to the search and, in any event, there was probable cause to search to truck.[1] After reviewing the evidence adduced at the hearing, the court concludes that there was probable cause to search the truck and, thus, the warrantless search of the vehicle did not violate defendants' Fourth Amendment rights.

Under the automobile exception to the warrant requirement, "[t]he police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." California v. Acevedo, 500 U.S. 565, 580 (1991). In the instant case, the record shows that there was probable cause to believe that the truck itself was specially equipped with secret traps to store contraband and, thus, was evidence of criminal activity. Moreover, there was also probable cause to believe that contraband was located in the secret compartments of the truck. As discussed earlier, a reliable confidential informant notified Detective Ludwig that Torres had asked Fajardo to retrieve a silver pickup truck from the Crown Plaza Hotel on September 2, 2003. (See Hr'g Tr. 14, 73.) The reliable information provided by the confidential informant was corroborated by Detective Ludwig's own observations on the scene. After Detective Ludwig responded to the hotel, he observed a silver Ford F-150 pickup truck drive into the parking garage. (Id. at 16.) Several minutes later, he saw Fajardo approach the parking attendant, who subsequently retrieved the silver pickup. (Id.) At this point, Detective Ludwig had already learned that the silver pickup was registered to Lindsay, (id.), who was also believed

---

[1] As an initial matter, the government argues that Lindsay lacks standing to challenge the search because he had no privacy interest in the truck once he permitted Fajardo to drive it. While the court recognizes that the record could potentially support the inference that Lindsay met Fajardo in the lobby of the Crown Plaza and gave him the keys to the truck, (see Hr'g Tr. 15-16), the court declines to conclude that Lindsay lacked standing to challenge the search of his truck. As discussed in further detail below, the court denies Lindsay's suppression motion solely on the ground that there was probable cause to search his truck.

to be involved in Torres's organization, (see id. at 11). Moreover, Detective Ludwig had previously seized another Ford F-150 pickup truck in connection with this investigation and discovered that it had been modified to include sophisticated traps behind the tail lights. (Id. at 21-22.) In addition, Fajardo provided little information in response to Inspector Stevens' questions about the truck. Fajardo disclaimed ownership of the truck and merely stated that a woman had given him the keys and told him to pick up the truck and bring it back to Queens. (Id. at 78-79.)

Based on the corroborated information provided by the confidential informants, Lindsay's suspected involvement in Torres's organization, the previous seizure of a Ford F-150 with secret traps, and Fajardo's vague and evasive answers, a reasonable officer could conclude that Lindsay's Ford F-150 was also fitted with secret traps and carrying contraband in connection with Torres's drug-trafficking and money-laundering scheme. The court therefore concludes that there was probable cause to believe that the specially-equipped truck itself was evidence related to the conspiracy and that there was contraband stored in the truck's secret traps. Consequently, the warrantless search of the truck did not violate defendants' Fourth Amendment rights.

B. Misjoinder

Fajardo argues that the government lacks any factual basis to charge him with conspiracy and, thus, there was no good faith basis to charge him in the same indictment as the rest of the defendants. The court concludes that Fajardo's claim is meritless. "[Rule 8(b) of the Federal Rules of Criminal Procedure] requires an allegation that the defendants 'have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses.'" United States v. Marcus Schloss & Co., 710 F. Supp. 944, 952 (S.D.N.Y. 1989)

9

(citations omitted). The Second Circuit has interpreted Rule 8(b) to mean "that the acts must be 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme[.]'" Id. (citations omitted). The government's conclusory allegation that there were two conspiracies and all defendants participated in each is sufficient to satisfy Rule 8(b), which merely requires an allegation. Thus, severance or dismissal of the indictment is unwarranted.

In the alternative, Fajardo seeks in camera review of the government's evidence. The court concludes that such a remedy is also entirely unwarranted. Marcus Schloss, the case upon which Fajardos relies for this proposition, expressly noted that such a remedy was unusual and unique to the defendant's circumstances in that case. 710 F. Supp. at 950 n.1. Given that the government's allegations are sufficient to satisfy Rule 8(b), the court concludes that there is no need to impose such an unusual remedy in the instant case.

C. Severance

Fajardo also moves for severance of defendants pursuant to Rule 14 of the Federal Rules of Criminal Procedure. The court concludes that severance is not warranted. As noted earlier, Rule 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." Fed. R. Crim. Proc. 8(b). When defendants are properly joined under Rule 8(b), a severance pursuant to Rule 14 should only be granted if there is a serious risk that a joint trial would either compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence. See Zafiro v. United States, 506 U.S. 534, 539 (1993). A defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple

lengthy trials. See United States v. Panza, 750 F.2d 1141, 1149 (2d Cir. 1984). Given that it is the defendant's burden to establish the grounds for severance, the court denies Fajardo's motion because he fails to present any of his grounds for severance with particularity. Moreover, any prejudice that may result from the joint trial can be cured by limiting instructions.

D.  Bill of Particulars

Fajardo also seeks an order directing the government to provide a bill of particulars. Rule 7(f) of the Federal Rules of Criminal Procedure only requires a bill of particulars when an indictment fails to sufficiently inform a defendant of the crimes with which he is charged. United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987). Requests for exact dates, places, and times in which events occurred and the respective roles and manner of participation of others in such events ignore the proper scope and function of a bill of particulars and are to be denied. United States v. Volpe, 42 F. Supp. 2d 204, 225 (E.D.N.Y. 1999). Fajardo requests (1) the date when he joined the alleged conspiracy; (2) the specific acts he performed in furtherance of the alleged conspiracy; (3) the date and time of each of those acts; and (4) a list of indicted and unindicted co-conspirators. After reviewing Fajardo's request, the court concludes that it is simply beyond the scope of a bill of particulars and should be denied.

E.  Discovery Obligations

Fajardo and Lindsay seek the immediate disclosure of exculpatory evidence or material pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and of impeachment evidence or material pursuant to Giglio v. United States, 405 U.S. 150 (1972). In addition, Fajardo seeks early disclosure of Rule 404(b) material.

Brady and its progeny do not require the immediate disclosure of all exculpatory material

11

upon a defendant's request. Rather, the government's obligation is to disclose Brady material in sufficient time for the defense to make effective use of it at trial. See United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001). In response to defendants' requests for Brady material, the government has made a good faith representation to the court and to defense counsel that it recognizes and has complied with its disclosure obligations under Brady and will continue to comply with those obligations. Neither defendant has suggested any reason to believe that the government will not comply with its obligations under Brady. Accordingly, the court accepts the government's representation and defendants' motions are denied. Defendants' requests for immediate disclosure of Giglio and 404(b) material are also denied at this time. However, the court will address the timing of disclosure of Giglio and 404(b) material at a conference to be held in advance of the trial.

F.  Destruction of Lindsay's Truck

Lindsay argues that the destruction of his truck by the government, at a minimum, supports an adverse inference against the government and may in fact show that the government violated Lindsay's due process rights by destroying potentially exculpatory evidence. Based on the current record, the court concludes that Lindsay's due process claim lacks merit. In addition, the court declines to allow an adverse inference to be drawn from the fact of the truck's destruction.

Lindsay frames his due process argument as a claim under Arizona v. Youngblood, 488 U.S. 51 (1988). However, Youngblood stands for the proposition that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 57-58. Here, Lindsay

has only shown that his truck was destroyed by the authorities and has provided no evidence suggesting that the government acted in bad faith. Indeed, Lindsay makes no allegations that the government acted in bad faith. Under Youngblood, the destruction of evidence in itself does not demonstrate the government's bad faith. See id. Thus, based on the current record, the court concludes that Lindsay's due process claim lacks merit.

The court must also deny Lindsay's request for an evidentiary ruling permitting an adverse inference to be drawn from the fact of the truck's destruction. In Kronisch v. United States, the Second Circuit recognized that "a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction." 150 F.3d 112, 126 (1998). However, the court also noted that "[i]n order for an adverse inference to arise from the destruction of evidence, the party having control over the evidence must have had an obligation to preserve it at the time it was destroyed." Id. at 127. "Once a court has concluded that a party was under an obligation to preserve the evidence that it destroyed, it must then consider whether the evidence was intentionally destroyed, and the likely contents of that evidence." Id. at 128. Here, even assuming that the government had an obligation to preserve the truck, Lindsay cannot establish that the vehicle was destroyed to hide unfavorable evidence. The government attempted contact to Lindsay on several occasions and return the vehicle to him, but he failed to respond. (See Gov't Opp. Ex. A.) Thus, it appears that the government destroyed the vehicle pursuant to its normal administrative procedures, not for any reason related to the instant case. Accordingly, based on the current record before the court, Lindsay's request for evidentiary ruling in connection with the destruction of the truck is also denied.

## CONCLUSION

For the foregoing reasons, the court denies defendants' pre-trial motions. Specifically, the court denies all of defendant Fajardo's pre-trial motions: (1) his motion to suppress the physical evidence retrieved from the truck; (2) his motion to dismiss the indictment based on misjoinder of the defendants; (3) his motion to sever the defendants; (4) his request for a bill of particulars; and (5) his request to compel the government to comply with its discovery obligations pursuant to Brady and its progeny. The court also denies all of defendant Lindsay's pre-trial motions: (1) his motion to suppress the physical evidence retrieved from his truck; (2) his request to compel the government to comply with its discovery obligations; and (3) his request that the court permit an adverse inference to be drawn from the fact of his truck's destruction by the government.

SO ORDERED.

_____
Allyne R. Ross
United States District Judge

Dated: August 2, 2006
Brooklyn, New York

SERVICE LIST:

*Attorney for the United States*

Carolyn Pokorny
United States Attorney
Eastern District of New York
147 Pierrepont Street
Brooklyn, NY 11201


*Attorney for Antidio Ramon Fajardo*

Bruce A. Barket
The Law Offices of Bruce A. Barket
666 Old Country Road, Suite 600
Garden City, NY 11530


*Attorney for Wilford Lindsay*
Jeremy L. Gutman
251 East 61st Street
New York, NY 10021